UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ROLLIN E. DIBBLE, et al.,

        Plaintiffs,                Civil Case No.
                                                  09-CV-13314

vs.

                                                    HON. MARK A. GOLDSMITH

SECURITY CORPORATION,

        Defendant.
_____/

### OPINION AND ORDER DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

**I.**       **Introduction**

Plaintiff Rollin Dibble filed this age discrimination suit against his former employer, Defendant Security Corporation, under the Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 621 et seq., and under Michigan's Elliott-Larsen Civil Rights Act (ELCRA), Mich. Comp. Laws § 37.2101 et seq. Before the Court is Security Corporation's motion for summary judgment. Because Dibble presents evidence from which a fact finder could conclude that Security Corporation's legitimate nondiscriminatory reason for terminating Dibble was pretextual, the motion is denied.

II.     **Factual and Procedural Background**

Dibble was employed by Security Corporation from February 15, 1999 until his termination on or about March 30, 2007.[1] At the time of his termination Dibble was 64 years old, and worked as a service technician with Security Corporation.

Security Corporation provides security equipment and service for burglary and fire alarms, network video cameras, network access control systems, and 24/7 monitoring and service. D.E. 36 at 1 (summary judgment motion). The company also has bank clients for which it provides security equipment and service related to vaults, teller drawers, and remote drive-up teller systems. Id. Security Corporation's various departments report to Greg Fry, the operations manager. Id. at 2. Dibble worked in the service department; while he was employed with Security Corporation, either Lee Womer or Mark Barnby was the service manager. Id.

Security Corporation is located in Novi, Michigan, and services customers in Michigan, Northern Ohio, and Northern Indiana. Id. at 1. Security Corporation's service technicians provide service to customers from an equipped company van which they use to service their assigned territory and to commute to and from home. Id. at 2. In Security Corporation's "Metro" area (i.e., Southeastern Michigan extending northwest to Lansing), the high density of customers means that the service territories are generally small; in West Michigan, where Dibble worked, lower customer density means that territories are larger. Id. With regard to the larger territories, Security Corporation intentionally hires service technicians (like Dibble) who live in the territory area in order to minimize unproductive drive time for the technician and to reach customers quickly. Id.

---

[1] Original plaintiffs Phillip Latona and Michael Magyar are no longer parties to this case. See docket entry (D.E.) 74 & 75 (stipulated orders of dismissal with prejudice as to Plaintiffs Latona and Magyar). Dibble is the only remaining plaintiff.

According to Security Corporation, the company delivers its products and services in one of two "formats": "service contracts" or "time and materials." Id. Under a service contract, a customer pays a fixed price per period to get all necessary service, including preventative maintenance. Under time and materials, customers order services or items as they are needed and the company charges the customer for its time and necessary materials. Id. The service contracts are more desirable because they generate predictable work and revenue. Id. at 3.

The parties give differing accounts of Dibble's work history while at Security Corporation. Security Corporation characterizes Dibble as often uncooperative, resisting performing service calls for other departments (such as installation and special projects).[2] Also according to Security Corporation, Dibble often upset customers.[3] In contrast, Dibble cites the last (March 2006) employee review he received in which service manager Lee Womer concluded that he met or exceeded standards in all categories -- including the one pertaining to communicating with customers -- and praised his productivity and teamwork.[4] The review

---

[2] In support, Security Corporation cites the affidavits of the installation manager and another employee in installation, stating that when asked to do a simple installation job typically done by an installer rather than a service technician, Dibble would strongly resist and complain about helping, unlike the other service technicians working in his area. See D.E. 36-7 & 36-8.

[3] In support, Security Corporation cites (i) a 2004 employee review of Dibble which stated that Dibble "requires improvement" in the category of "planning and organizing": "Ron has a good handle on his organization but does tend to upset customers with parts issues. Do not make promises we can[']t keep" and (ii) a 2005 written warning Dibble received after a customer complained when Dibble used inappropriate language after finding he was missing some necessary screws. See D.E. 36-9 & 36-10.

[4] The 2006 employee review stated in part:

> Ron is a strong team player and ideal technician; he travels to other territories on a regular basis to help out technicians that need it and at the same time keeps his own territory well under control.
> . . .
> Ron communicates well with dispatch and does close calls in real time. Ron did receive a single customer complaint in August 2005 regarding his use of

3

recommended that Dibble's "commitment to our department and to our customer's needs should be rewarded with a promotion to Senior Service Technician." D.E. 42-12.

In November 2006 Huntington Bank terminated its bank equipment services contract with Security Corporation for its West Michigan region, effective January 1, 2007. D.E. 36-28. This meant that Security Corporation lost the contract work related to the banking equipment, though it did not lose the contract work related to non-banking equipment (such as video surveillance cameras, fire alarms, burglar alarms). Still, the banking equipment service work was more than half of the service work at each Huntington branch. D.E. 36 at 12. Service manager Mark Barnby estimated that $200,000 in revenue was lost as a result. D.E. 36-5 at 83 (Barnby deposition).

According to Security Corporation, in the last several years before his termination, Dibble admitted that he did not have enough service work to do in his territory and that he had to look for work to keep busy. He frequently asked central station manager Jenifer Jason, who managed the company's service dispatch, to assign him service calls in the neighboring territories of fellow West Michigan technicians Greg Garska and Duane Hoops. D.E. 36-3 at 2 (Jason affidavit). While Security Corporation acknowledges that the Huntington Bank work was also lost in the territories serviced by Garska and Hoops, it contends that Garska and Hoops "had more than enough work to do in their territories," while Dibble had already been struggling to

---

> language, which resulted in a written warning. There have been no further incidents since.
> . . .
> Ron continues to be as productive as possible and wastes very little time. Ron is still the most productive technician in the region and always gives his customer[s] 110%.
> . . .
> Keep up the good work Ron!

D.E. 42-12.

find enough work to keep busy. D.E. 36 at 12. Accordingly, service manager Mark Barnby and operations manager Greg Fry made the business decision to terminate Dibble and assign the bulk of his territory to Greg Garska and the remaining portion to Duane Hoops. Id. at 12. In addition, Security Corporation maintains that Greg Garska had better training, knowledge, and capability regarding access panels, a relevant skill in the territories at issue, and that both central station manager Jenifer Jason, and employees in the installation department had more problems and dissatisfaction with Dibble than with Garska or Hoops. Id. at 13.

Dibble takes issue with several aspects of Security Corporation's account. Dibble stresses that the company did not lose Huntington Bank as a customer, and maintains that "the billing arrangement changed, not the work performed or the revenues generated." D.E. 42 at 9 (Plaintiff's response). Dibble cites a sampling of invoices for service work he performed for Huntington after January 2007. See D.E. 42-34. Dibble also points out that the company's service department revenue in June 2007 (after Huntington terminated the contract) was higher than it was in June 2006 (before Huntington terminated). See D.E. 42-36 (income statements).

Further, Dibble disputes that he lacked work and argues that Greg Garska was the one struggling to keep busy. D.E. 42 at 10. Dibble cites Garska's August 2006 employee report, which noted that Garska averaged 2.69 calls per day (in contrast to Dibble's 4.12) and stated that "Greg's only problem is that his territory is not busy enough to keep him busy." D.E. 42-39; 42-12. With regard to Garska's superior training, Dibble argues that he had asked to obtain the access panel training that Garska received, but that Security Corporation did not provide him with the training. D.E. 42-10 at 49-53 (Dibble deposition).[5]

---

[5] Specifically, Dibble contends that Security Corporation (i) gave part of his territory to Garska, (ii) assigned Garska a major new account, Mona Schools, which was in Dibble's territory, and

On or about March 30, 2007, Barnby met with Dibble and informed him that he was terminated "due to the loss of the Huntington service in Western Michigan." D.E. 36-29 (payroll change notice).

At some point thereafter Dibble filed a complaint with the Equal Employment Opportunity Commission (EEOC). In October 2007 Security Corporation sent a letter to Dibble "recalling" him and offering him a position in the Detroit Metropolitan area. D.E. 42-58 (reinstatement offer). Dibble did not respond.[6] On July 18, 2008, the EEOC issued a determination that there was reasonable cause to believe a violation had occurred. See D.E. 42-8 (EEOC letter citing violations of, inter alia, the ADEA). The EEOC apparently issued a right-to-sue notice in June 2009. D.E. 1 at ¶ 24 (complaint). On August 21, 2009, Dibble filed suit in this Court, alleging age discrimination under the ADEA and the ELCRA. The parties engaged in discovery, and on June 30, 2010, Security Corporation filed the instant motion for summary judgment. This Court held a hearing on December 21, 2010.

### III.   Discussion

#### A. Summary Judgment Standard

A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When evaluating a summary judgment motion,

> credibility judgments and weighing of the evidence are prohibited. Rather, the evidence should be viewed in the light most favorable to the non-moving party.

---

(iii) gave Garska, and not Dibble, the access panel training necessary to service the school's equipment. See D.E. 42 at 10-11; 42-10 at 51-59.

[6] The letter stated that failure to respond by October 26, 2007 "will be considered a voluntary resignation." D.E. 42-58. Although the letter was dated October 10, 2007, it was postmarked on October 23, 2007, and Dibble states that he received it on October 25th. See id.; D.E. 42-59 (postmark).

> Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). Thus, the facts and any inferences that can be drawn from those facts [ ] must be viewed in the light most favorable to the non-moving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986).

Biegas v. Quickway Carriers, Inc., 573 F.3d 365, 373 (6th Cir. 2009) (quotation marks omitted).

**B. ADEA**

Under the ADEA, it is "unlawful for an employer . . . [to] discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1). Similarly, Michigan's ELCRA prohibits "discriminat[ing] against an individual with respect to employment, compensation, or a term, condition, or privilege of employment, because of . . . age . . ." Mich. Comp. Laws § 37.2202(a). Because "ELCRA claims are analyzed under the same standards as federal ADEA claims," the Court's analysis of Dibble's ADEA claim also applies to his ELCRA claim. Geiger v. Tower Auto., 579 F.3d 614, 620, 626 (6th Cir. 2009)

A plaintiff may establish a violation of the ADEA by either direct or indirect (also called circumstantial) evidence. Blair v. Henry Filters, Inc., 505 F.3d 517, 523 (6th Cir. 2007), abrogated on other grounds by Gross v. FBL Fin. Servs., Inc., 129 S. Ct. 2343 (2009). "Direct evidence of discrimination is that evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." Wexler v. White's Fine Furniture, Inc., 317 F.3d 564, 570 (6th Cir. 2003) (en banc) (internal quotation marks omitted). "Circumstantial evidence, on the other hand, is proof that does not on its face establish discriminatory animus, but does allow a factfinder to draw a reasonable inference that discrimination occurred." Id. Regardless of the type of evidence a plaintiff uses to support his claim, "the burden of persuasion remains on ADEA plaintiffs to demonstrate 'that age was the

7

"but-for" cause of their employer's adverse action.'" Geiger, 579 F.3d at 620 (quoting Gross, 129 S. Ct. at 2351 n.4).

Here, Dibble does not offer any direct evidence of discrimination. Thus, in the Sixth Circuit, courts apply the evidentiary framework set out in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-05 (1973). Schoonmaker v. Spartan Graphics Leasing, LLC, 595 F.3d 261, 264 n.2 (6th Cir. 2010). Under this framework,

> the plaintiff must first submit evidence from which a reasonable jury could conclude that he or she established a prima facie case of discrimination. The defendant must then offer admissible evidence of a legitimate, nondiscriminatory reason for its action. If the defendant does so, the plaintiff must identify evidence from which a reasonable jury could conclude that the proffered reason is actually a pretext for unlawful discrimination.

Blair, 505 F.3d at 524 (internal citations omitted). "Although the burdens of production shift, [t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." Id. (internal quotation marks omitted).

### 1. Prima Facie Case

In order to make out a prima facie case of age discrimination, a terminated plaintiff normally must show that: (i) he was a member of a protected age class (i.e., at least forty years old), (ii) he suffered an adverse employment decision, (iii) he was qualified for the job, and (iv) the employer gave the job to a younger employee. Blair, 505 F.3d at 529. With regard to reduction-in-force cases, because a plaintiff has not been replaced by another employee, "the fourth prong is modified" to require a plaintiff to provide "additional direct, circumstantial, or statistical evidence tending to indicate that the employer singled out the plaintiff for discharge for impermissible reasons." Id. (quoting Erceovich v. Goodyear Tire & Rubber Co., 154 F.3d 344, 350 (6th Cir. 1998)). One example of when this reduction-in-force fourth prong is satisfied

is when the plaintiff "demonstrates that a comparable non-protected person was treated better." Ercegovich, 154 F.3d at 350.[7] However, there are various ways by which a plaintiff may establish a prima facie case. See Blair, 505 F.3d at 529. "The key question is always whether, under the particular facts and context of the case at hand, the plaintiff has presented sufficient evidence to permit a reasonable jury to conclude that he or she suffered an adverse employment action under circumstances giving rise to an inference of unlawful discrimination." Id. Finally, the burden of establishing a prima facie case at this stage is not onerous; "[g]enerally, at the summary judgment stage, a plaintiff's burden is merely to present evidence from which a reasonable jury could conclude that the plaintiff suffered an adverse employment action 'under circumstances which give rise to an inference of unlawful discrimination.'" Id. at 528 (citing Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 253 (1981)).

Security Corporation concedes the first three prongs of the prima facie case. D.E. 36 at 19. Thus, the Court will focus on the fourth prong.

Dibble first maintains that this is not a reduction-in-force case because he was replaced. See, e.g., Barnes v. GenCorp., Inc., 896 F.2d 1457, 1465 (6th Cir. 1990) ("An employee is not eliminated as part of a work force reduction when he or she is replaced after his or her discharge."). Dibble presumably wishes this Court to apply the traditional termination fourth prong, that the employer gave the job to a younger employee. The Court rejects this argument for two reasons. First, Dibble's work was redistributed among other existing West Michigan employees who were performing related work. The Sixth Circuit has specifically instructed that "a person is not replaced when another employee is assigned to perform the plaintiff's duties in

---

[7] By this, the Ercegovich court means that a plaintiff must establish "(1) that he was a member of a protected class and (2) that for the same or similar conduct he was treated differently than similarly-situated non-minority employees." Mitchell v. Toledo Hosp., 964 F.2d 577, 582-83 (6th Cir. 1992).

addition to other duties, or when the work is redistributed among other existing employees already performing related work." Id.

Second, the individuals that Dibble cites as his replacements did not actually replace him. Dibble lists three individuals as alleged replacements: (i) 37-year-old Lee Womer, who was demoted to service technician from service manager, (ii) 29-year-old Seth Leising, and (iii) 44-year-old Douglas Black. D.E. 42 at 14. Of the three individuals, two (Womer and Leising) worked in a completely different area than Dibble. Dibble worked in Security Corporation's West Michigan area. Womer worked in the Metro Detroit area, and Leising worked in Ohio. Dibble makes no claim that either Womer or Leising serviced his territory. The third individual, Black, may have worked in the West Michigan area.[8] However, Black was not a new addition: at the time Dibble was terminated on March 30, 2007, Black was working as a service technician in the West Michigan area. It was only after Dibble had already left the company that Black resigned (April 2007) and then was rehired (June 2007). See D.E. 42-48; 42-49.

Accordingly, there is no genuine issue of material fact whether Security Corporation replaced Dibble. Thus, Dibble cannot make out a prima facie case by arguing that the company gave his job to a younger employee.

However, Dibble successfully makes out a prima facie case by showing that comparable non-protected employees were treated better. Dibble cites numerous reasons in support. The most compelling are, first, that Security Corporation offered key training to "younger technicians," but refused to provide the same training to Dibble and, second, that Security Corporation altered territory lines to favor younger workers. In particular, Dibble cites (i)

---

[8] Black's territory is listed as "Battle Creek" rather than "West" on the Security Corporation's service technician list. See D.E. 36-34. But the company's territory map appears to show Battle Creek as a West Michigan territory. See D.E. 36-2.

Security Corporation's giving part of what had been his territory to 36-year-old Greg Garska, (ii) its giving Garska the Mona Schools account, despite the fact that it was in Dibble's territory, and (iii) its giving Garska, and not Dibble, access card training, despite the fact that Dibble had asked for it. See D.E. 42 at 15-16; 42-10 at 51-59. Security Corporation does not deny Dibble's contentions about his territory, Mona Schools, and training. Nor does it otherwise address these issues in its reply brief. Therefore, the Court concludes that a reasonable fact finder could conclude that Security Corporation treated a comparable non-protected person better. Dibble has satisfied the fourth prong and made out a prima facie case of age discrimination.[9]

### 2. Legitimate Nondiscriminatory Reason

Security Corporation responds that it terminated Dibble for the legitimate nondiscriminatory reason that the loss of contract revenue from Huntington Bank meant that it would have to reduce the number of West Michigan service technicians. Further, Security Corporation contends that Dibble specifically was selected for termination because of the low workload in his territory, the fact that his territory was directly adjacent to that of Duane Hoops and (the better trained) Greg Garska and could be "absorbed" by theirs, and Dibble's overall performance and abilities. See D.E. 36 at 23; D.E. 45-6 (Barnby letter to EEOC). Security Corporation has met its burden to articulate a legitimate nondiscriminatory reason for Dibble's termination.

---

[9] Dibble also argues that statistical evidence suggests that Security Corporation terminated the Plaintiffs because of their age. See D.E. 42 at 17-19. Dibble submits an expert report which states that "there is strong statistical evidence that older workers were terminated at a higher rate than younger workers were." D.E. 42-57; 42-56. Because Dibble offers the statistical information in order to meet the fourth prong of his prima facie case, and he presents sufficient other evidence to establish a prima facie case, the Court will not consider the statistical evidence for the purpose of making a determination on the instant summary judgment motion.

### 3. Pretext

Since Defendant Security Corporation has articulated a legitimate nondiscriminatory reason, the issue that remains is pretext. In order to show pretext, a plaintiff must demonstrate that the defendant's legitimate nondiscriminatory reason (i) has no basis in fact, (ii) did not actually motivate the defendant's challenged conduct, or (iii) was insufficient to warrant the challenged conduct. <u>Wexler v. White's Fine Furniture, Inc.</u>, 317 F.3d 564, 576 (6th Cir. 2003) (en banc). Dibble offers several reasons why Security Corporation's rationale is pretextual, with some challenging the general reduction-in-force rationale, and others challenging the company's reasons for selecting Dibble in particular for termination.

#### a. Pretext: Reduction in Force

With regard to the reduction in force, Dibble first argues that there was no loss in revenue from the loss of the Huntington Bank contract. D.E. 42 at 20. The Court rejects this as a basis for pretext. The invoices showing Dibble performing work for Huntington after the termination of Huntington's contract do not establish that there was no loss in revenue, as Dibble does not establish how those figures compare to revenues from Huntington before it terminated its contract. Further, the June 2006 and June 2007 "snapshots" showing the company's service department revenue are of limited value. They do not separate the West Michigan revenue from the revenue of the entire service department. And they merely show a single month as a comparison point. This evidence, even if believed by a fact finder, does not establish that Security Corporation did not experience a loss in revenue.[10]

---

[10] There is conflicting information about the amount of that loss. In his deposition, Fry estimated that the loss was $350,000. Barnby estimated a more modest $200,000. Regardless of the precise amount of actual loss, Dibble's proffered evidence does not rebut the assertion that revenue was lost.

Second, Dibble argues that Security Corporation's offer of reinstatement is inconsistent with a reduction in force. D.E. 42 at 22-23. This is potentially a powerful argument: If Security Corporation was truly forced to reduce its number of West Michigan service technicians because of a loss of business, why was it suddenly able a few months later to offer Dibble a position again? This argument is flawed, however. Dibble's reinstatement offer was for a position outside of the West Michigan area, in the Detroit Metro area. In addition, as Dibble himself argues, the offer did not seem legitimate: (i) it was sent so that it arrived almost beyond the deadline to respond, (ii) Barnby admitted that, despite the letter, he did not have any actual job openings, and (iii) Barnby stated in deposition that he made the offer "to make this EEOC thing go away." D.E. 42-6 at 163. Thus, the letters do not undercut the reduction-in-force rationale.

Third, Dibble argues that Security Corporation's claim that it was economically necessary to reduce the number of West Michigan service technicians is rebutted by the fact that the company spent "lavishly" on a $100,000 conference room renovation, and bartered with one customer for the use of a luxury suite instead of accepting payments worth $160,000. D.E. 42 at 21. In response, Security Corporation argues that the reduction in force was due to "business considerations" as distinguished from "economic necessity," and that therefore it need not defend against economic necessity arguments. See D.E. 36 at 24 (citing Grzybowski v. DaimlerChrysler Servs., No. 05-71286, 2006 WL 1374050, at *4 (E.D. Mich. May 17, 2006) (reduction in force need not be driven by economic necessity; it can be driven by business considerations). This Court need not resolve the question of economic necessity versus business consideration. On this record, a reasonable fact finder could not conclude that the expenditures cited by Dibble are evidence of pretext. Because Dibble presents no evidence describing when the conference room was renovated, he fails to establish that there was lavish spending around

13

the time of his termination. Further, the minimal documentation apparently showing the contract for the luxury suite does not establish that Security Corporation chose the option of a luxury suite rather than accepting $160,000 in payments. D.E. 42-53. Also, because the evidence does not establish when the luxury suite deal was negotiated, Dibble does not show that there was a frivolous financial decision around the time of his termination. Accordingly, the Court rejects this argument.

Dibble's fourth argument, however, does raise a question of fact as to pretext relating to the reduction-in-force. Dibble argues that Security Corporation lacked a plan for carrying out its reduction in force. See Blair, 505 F.3d at 533 ("a lack of evidence regarding a company's objective plan to carry out a reduction in force" is a "factor[ ] that might indicate that an alleged reduction in force is pretextual.") (citation omitted); see also Godfredson v. Hess & Clark, Inc., 173 F.3d 365, 374 (6th Cir. 1999) (factors that might indicate that an alleged reduction in force is pretextual include "general business improvement, a lack of evidence regarding a company's objective plan to carry out a reduction in force, and a situation in which only one or two management employees are aware of the reduction plan."). Security Corporation argues that "a formal, written plan or process" was not necessary to execute a reduction in force because Fry and Barnby knew all the service technicians and the relevant factors. D.E. 45 at 1. This may be so. However, Fry and Barnby appear to be the only two management employees involved in the reduction decision. And, both Barnby and Fry describe a decisionmaking process that was undocumented. See D.E. 42-9 at 98-102 (Fry deposition); D.E. 36-5 at 170-71 (Barnby deposition).[11] Thus, the record reflects a lack of objective evidence of any plan related to the

---

[11]Barnby described the process in his deposition:

    Q:    Do you have anything in writing explaining the criteria you used?

reduction in force, and a limited number of people who knew about the reduction in force. These are appropriate factors for a fact finder to consider and create a genuine issue of material fact regarding pretext.

### b. Pretext: Selecting Dibble for Termination

In addition to Dibble's arguments that the general reduction-in-force rationale was pretextual, Dibble argues that the company's reasons for selecting him in particular for termination are pretextual.

First, Dibble argues that Security Corporation's rationale that the loss of Huntington Bank created a lack of work is pretext. In support, Dibble cites the hiring of five individuals in the few months directly after Dibble was terminated. D.E. 42 at 21. The Court rejects this

---

A: No.
Q: And do you have any type of an analysis that was done that would indicate how you arrived at your decisions?
A: Nothing really on paper specifically. A lot of it is just knowing the basic call volume of what comes in every day and knowing that Ron was always looking for something to do because he didn't have the calls coming in on a regular basis. He was looking into other areas to help out the other guys just to keep busy.
Q: But you said you looked at call volumes, you looked at all these things, whatever you looked at. Do you have any type of a document you can show us that indicates the things that you looked at [and how you arrived at your decisions]?
. . .
A: No. I mean we've been doing this long enough, a lot of it is gut instinct.
. . .
Q: Okay. Any communications between you and Mr. Fry discussing who was going to be let go?
A: Most of that was done in his office, not in writing.
Q: Anything – any emails even?
A: No.
Q: So really, sitting here today, we have no way of tracing the decision-making process, other than accepting your testimony and Mr. Fry's testimony on this, right?
A: I guess that's what I'm saying.

D.E. 36-5 at 170-71.

argument. Of the new hires Dibble cites, all but one were either out of Dibble's area, or for a position other than service technician. The remaining individual, Doug Black, was (as explained above) not a new hire. Accordingly, these hires do not rebut the assertion that there was a lack of work for West Michigan service technicians. Dibble also cites in support the fact that Service Corporation's labor costs "barely dropped," from $133,717 in June 2006 (before Dibble and the other two original plaintiffs were fired) to $130,006 in June 2007 (after their termination). D.E. 42 at 10, 22; 42-36. Setting aside the fact that the labor costs Dibble cites actually show a $3700 decrease in cost, these figures are of little use in determining whether there was a lack of work in West Michigan. The figures appear to be company-wide. In addition, the relationship between labor costs and lack of work is unclear.

Dibble's remaining arguments are substantially better, however. Dibble's second argument is that the purported issues with his job performance are pretext. This point is convincing. To the extent Dibble's performance might have been unsatisfactory because of the 2005 incident for which he received a written warning, the company's own subsequent evaluation of his skills in this area indicated that he met the company's standards and did not seem to regard the prior complaint as indicative of a performance problem. See D.E. 42-12 (March 2006 employee review stating, "Ron communicates well with dispatch and does close calls in real time. Ron did receive a single customer complaint in August 2005 regarding his use of language, which resulted in a written warning. There have been no further incidents since."). To the extent that Dibble's performance might have been unsatisfactory because of his purported resistance to performing service calls for other Security Corporation departments, the company's own review again tells a different story, indicating that Dibble "exceeds standards" in the category of "Team Working Skills," and stating that "Ron is a strong team player and ideal

technician; he travels to other territories on a regular basis to help out technicians that need it and at the same time keeps his own territory well under control." Id. The employee review does not mention the resistance that the company now cites. A reasonable fact finder could conclude from this evidence that at least part of Security Corporation's explanation for choosing to terminate Dibble has no basis in fact.

Third, Dibble argues that Security Corporation changed its rationale for terminating him, providing evidence that the reason given was pretext. "An employer's changing rationale for making an adverse employment decision can be evidence of pretext." Asmo v. Keane, Inc., 471 F.3d 588, 596 (6th Cir. 2006). Although Security Corporation denies that its explanation has shifted, a reasonable fact finder could disagree. When Dibble was terminated he was informed that it was "due to the loss of the Huntington service in Western Michigan." D.E. 36-29 (payroll change notice). Similarly, Fry testified at his deposition that Dibble was terminated because his territory lost the most Huntington-related business and not for performance reasons. D.E. 36-4 at 47.[12] However, Barnby stated to the EEOC that in addition to the loss of the Huntington business, Security Corporation considered Dibble's "past performance, geographic location, as well as overall abilities." D.E. 42-38. And before this Court, Security Corporation argues that (in addition to the loss of the Huntington business) it terminated Dibble based on "customer need, performance and skill set." D.E. 45 at 5. The company also specifically argues that Garska was better trained than Dibble and that Dibble had caused "problems and dissatisfaction" for the Installation Department and Central Station Manager Jenifer Jason. D.E. 36 at 13. Security Corporation's evolving explanations could be understood to be raising the issue of

---

[12] See id. ("Again, with Mr. Dibble it was strictly territory, who is losing the most, who can be – remain productive in that area. That was that. It had no bearing on performance. Mr. Dibble did, you know, good work, but . . . it was just – unfortunately, it was strictly a financial decision, nothing more.")

performance for the first time after Dibble had already been terminated. A fact finder could conclude that this is evidence of pretext.

In addition to the pretext arguments raised by Dibble, the Court considers the unrebutted evidence referenced in the prima facie case analysis that Security Corporation (i) gave part of Dibble's territory to Garska, (ii) gave Garska the Mona Schools account, despite the fact that it was in Dibble's territory, and (iii) gave Garska, and not Dibble, access card training, despite the fact that Dibble had asked for it. See Blair, 505 F.3d at 533 (a court may consider evidence a plaintiff presented in support of his prima facie case as evidence for pretext purposes). A fact finder could conclude that this evidence rebuts two of the legitimate nondiscriminatory reasons Security Corporation gave for selecting Dibble for termination. The company cited the low workload in Dibble's territory, and argued that, in contrast, Garska and Hoops had more than enough work. However, because there is evidence that Security Corporation gave some of Dibble's territory to Garska, a fact finder could conclude that the disparity in workload was due at least in part to the company's own actions. In addition, another reason Security Corporation gave for selecting Dibble was that Garska was better trained. However, because there is evidence that Dibble sought the better training that Garska had received from Security Corporation -- and was refused -- a fact finder could conclude that the company itself was responsible for the disparity in training.

Accordingly, Dibble has presented several points sufficient to show a genuine issue of material fact as to pretext.

## IV. Conclusion

For the foregoing reasons Dibble has presented sufficient evidence to create a genuine issue of material fact with regard to his ADEA and ELCRA claims. Defendant Security Corporation's motion for summary judgment (D.E. 36) is DENIED.

SO ORDERED.

Dated: January 5, 2011                                              s/Mark A. Goldsmith
                                                                    MARK A. GOLDSMITH
                                                                    United States District Judge

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on January 5, 2011.

                                                                    s/Deborah J. Goltz
                                                                    DEBORAH J. GOLTZ
                                                                    Case Manager